IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SKY D. STOODT, | ) | Case No. 3:23-cv-52 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.   Introduction

Plaintiff, Sky D. Stoodt, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") adopted language in the residual functioning capacity without sufficient explanation, I recommend that the Commissioner's final decision denying Stoodt's applicaitons for DIB and SSI be vacated and that Stoodt's case be remanded for further consideration.

## II.   Procedural History

On April 16, 2018, Stoodt filed applications for DIB and SSI.  (Tr. 15, 89, 119, 218, 220). Stoodt alleged an onset date of June 30, 2017, (Tr. 15, 218, 220, 238), and asserted he was disabled due to depression, anxiety, and functional capacity seriously limited in self direction and interpersonal skills, (Tr. 66, 92, 121, 129, 242).  His application was denied at the initial

level, (Tr. 121-26), and then upon reconsideration, (Tr. 129-133).  He then requested a hearing.

(Tr. 134-135).  On December 12, 2019, a hearing was held before an Administrative Law Judge

("ALJ").  (Tr. 33-64).  On December 26, 2019, the ALJ issued an unfavorable decision, finding

that Stoodt had not been under a disability within the meaning of the Social Security Act from

June 30, 2017 through the date of the decision.  (Tr. 12-32).  Stoodt requested review of the

decision by the Appeals Council.  (Tr. 215-217).  On August 17, 2020, the Appeals Council

denied Stoodt's request for review, making the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-6).

On October 16, 2020, Stoodt sought judicial review.  CM/ECF for U.S. Dist. Ct. for N.D.

Ohio, No. 3:20-CV-02370, Doc. 1.  On March 10, 2022, this court vacated the Commissioner's

decision and remanded the case for further proceedings after finding that the ALJ "failed to

properly explain her reasoning when determining Plaintiff's RFC as related to Plaintiff's social

interaction limitations."  (Tr. 883-85); *see also Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-CV-

02370, 2022 WL 716105, at *1 (N.D. Ohio Mar. 10, 2022)("*Stoodt I*").

On May 7, 2022, the Appeals Council issued a remand order pursuant to the court's

decision.  (Tr. 888-90).  After remand, the ALJ held a hearing on September 6, 2022.

(Tr. 779-818).  On October 27, 2022, the ALJ issued a new unfavorable decision, finding that

Stoodt was not disabled under the Social Security Act based on Stoodt's April 16, 2018

applications for DIB and for SSI. (Tr. 760-771).  In doing so, the ALJ determined at Step Four

that Stoodt had the residual functional capacity ("RFC") to perform a full range of work at all

exertional levels, except that:

> [Stoodt] can perform simple, routine, and repetitive one to three step short-cycle
> tasks at any given time, but not at a production rate pace so, for example, no
> assembly line or conveyor belt work; and can respond appropriately to occasional,
> superficial interaction with supervisors, co-workers, and the general public.
> Superficial is defined as able to be in proximity to others, exchange greetings with
> others, and engage in discussions that do not require the individual to resolve

2

> conflict among others or to perform team or tandem work with co-workers. The claimant can tolerate few changes in the work environment, defined as routine job duties that remain static and are performed in a stable, predictable work setting; any changes need to occur infrequently and be adequately and easily explained.

(Tr. 762-765).  The ALJ further determined that there are jobs that exist in significant numbers in the national economy that Stoodt can perform considering his age, education, work experience, and RFC, basing that decision on the vocational expert's testimony.  (Tr. 770-771).

Stoodt did not seek Appeals Council review, rendering the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 416.1484(d).  On January 10, 2023, Stoodt filed a complaint to obtain judicial review, initiating the instant proceedings.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Stoodt was born on August 17, 1992 and was 24 years old on the alleged onset date. (Tr. 26, 770).  Stoodt completed school through the eleventh grade and later received his GED. (Tr. 40, 243).  The ALJ determined that there was no past relevant work because Stoodt's past work did not rise to the level of substantial gainful activity.  (Tr. 41-43, 776, 793).

### B.    Relevant Medical Evidence

#### 1.    Uncontested Evidence

Neither party contests the objective medical evidence, Stoodt's subjective symptom complaints and testimony, or the opinion evidence.  Nor do they contest the ALJ's summary of it, save as to the state agency psychological consultants.  *See generally* ECF Doc. 7; ECF Doc. 9; ECF Doc. 11.  Independent review does not reveal any material inconsistencies between the ALJ's summary of such evidence and the record before this court.  *Compare* (Tr. 760-771), *with* (Tr. 65-118, 407-756, 1024-1348).  Because of the limited nature of the parties' contentions, an independent recitation of the record is unnecessary and would be duplicative of the extensive

record discussion in *Stoodt I*.  Consequently, I adopt the following summary of the evidence

from the ALJ's decision.[1]

> The claimant [(Stoodt)] applied for supplemental security income and disability
> benefits alleging that he has been unable to work due to depression; anxiety;
> problems with self-direction; and problems with interpersonal skills ([Tr. 241-
> 248]).  During a telephone call with Social Security, the claimant alleged that he
> would leave the house once or twice per month, and would shop once a month,
> sometimes "shutting down" while shopping due to the amount of people in the store
> ([*Id.*]).  He noted that he enjoyed drawing, writing, and playing video games.  He
> noted no current panic attacks, which he attributed to his medications ([*Id.*]).  The
> claimant's representative submitted prehearing briefs, summarizing the claimant's
> allegations and medical history ([Tr. 379-382, 406, 1016-1020]).  Brenda Stoodt
> submitted a summary timeline of the claimant's mental health treatment ([Tr. 392-
> 395]).  At his first hearing, the claimant testified that he is unable to work due to
> his inability to be around other people, particularly when there are more than two
> people in a room due to his anxiety.  He described feeling like he is trapped and he
> has a tendency to shut down when he is anxious.  The claimant reports having
> sleeping spells, mood swings, generally sensation of grogginess, and lack of
> motivation, particularly when he knows he has to engage in a social situation,
> including a family event.  At his most recent hearing, the claimant testified that he
> continues to live with his mother.  He feels as though his conditions have worsened
> since his last hearing, and that he does not leave the house or take care of himself.
> He has panic attacks and difficulty sleeping, he testified.  He spends most of his
> day watching television, and will sometimes play on his phone or use social media
> to follow artists.
>
> * * *
>
> Consistent with his reports, the claimant presented on various occasions to several
> local emergency departments for management of his acute anxiety symptoms ([Tr.
> 496-526, 537-585]).  However, at that time, he did not follow up with outpatient
> follow up treatment recommendations.  In 2014, the claimant admitted that he had
> ongoing anxiety and depression issues, but he had never seen a counselor for
> additional treatment ([Tr. 418]).  Prior to his alleged onset date, in August of 2016,
> the claimant established treatment for complaints of anxiety, stress, and compulsive
> checking, along with difficulty focusing ([Tr. 453, 637]).  He was prescribed
> medication ([Tr. 638-639]).  In November of 2016, the claimant reported that he
> felt well, and was doing well on medication, though he had some recently increased
> anxiety regarding family issues and deaths in the family ([Tr. 645]).  Examination
> showed an improved mood with smiling, and it was noted that his medications were

---

[1] *See Biestek v. Comm'r of Soc. Sec*., No. 16-CV-10422, 2017 WL 1214456, at *1-2 (E.D. Mich. Feb. 24,
2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 WL
1173775  (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 778 (6th Cir. 2017), *aff'd by* 139 S. Ct. 1148, 203
L. Ed. 2d 504 (2019).  *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v.
Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

4

working well ([Tr. 647, 649, 653]).  Conservative treatment continued throughout the period at issue.  Shortly after his alleged onset date, the claimant reported that he was "doing fine," with controlled moods and no reported side effects ([Tr. 655]).  Although worsening psychological symptoms were reported at times, these were addressed with medication adjustments.  For example, in September of 2016, follow-up notes show the claimant was doing "fair," but did not believe his medication was effective ([Tr. 643]).  He noted in June of 2017 that his medications were working well, with depression "a lot better" ([Tr. 449]).  Examination showed full orientation, good eye contact, good affect, and improved depression and anxiety ([*Id.*]).  He requested a medication change in November of 2017, due to a side effect of increased appetite ([Tr. 659-660]).  He was advised at that time to seek outpatient counseling services, and was prescribed new medications to help with irritability and rage ([Tr. 635-684]).  Since that time, the claimant has taken appropriate medications for his alleged impairments, and the record shows that the medications have been relatively effective in controlling the claimant's symptoms.  The claimant described his medications as taking the "edge off" and indicate that "without meds, I would be a wreck" ([Tr. 490]).

Psychological consultative examination was performed in June of 2018, by Michael Wuebker, Ph.D. ([Tr. 487-495]).  The claimant reported that he was unable to work due to depression and anxiety.  He noted that his most recent job was temporary work from home, where he had no problems with attendance and was a "very hard worker," although he did have some problems staying focused if nervous.  He was polite and courteous to others at work, he stated, and was usually able to complete work tasks.  He denied any current formal mental health care or history of psychiatric hospitalization, although he did participate in counseling as a child, and was prescribed medications by his primary care provider for mental health complaints.  He noted that the medications were helpful.  Examination showed cooperative behavior, adequate eye contact, normal speech, depressed mood, and restricted affect.  He denied any hallucinations, and was full[y] oriented.  The claimant reported that he enjoyed drawing and writing, and would spend the day watching television, playing with his cat, or sometimes looking for jobs.  He was able to prepare simple meals, clean, and shop for brief intervals. He was diagnosed with major depressive disorder and social anxiety disorder ([*Id.*]).

In June 2018, the claimant had been taking medications for about 18 months.  At a follow up visit in July, the claimant's provider again recommended that the claimant establish more specialized mental health treatment ([Tr. 665-666]).  He did not establish formal mental health care until September of 2019 ([Tr. 712-745]).  Records show that he worked with the therapist to develop social skills, express emotions, and improve daily functioning through healthy coping skills ([Tr. 712-713]).  In December of 2019, the claimant reported that he had begun attending counseling, but continued to have some residual anxiety symptoms ([Tr. 746]).  His medications were changed ([Tr. 747]).  He established with a new provider in February of 2020, where examination demonstrated normal cognitive functioning, full orientation, normal memory and concentration, and intact judgment ([Tr. 1315]).  He was cooperative, with an anxious mood, congruent affect, and denial of suicidal ideations ([Tr. 1316]).  His medications were changed.

5

Examination at a progress assessment in April showed appropriate grooming, cooperative behavior, normal speech, euthymic mood, full affect, logical thought processes, and appropriate insight and judgment ([Tr. 1030]).  The claimant reported in June that his medication had been helpful, and he had experienced improvements in mood and anxiety ([Tr. 1264]).  Examination showed euthymic mood with some residual anxiety, normal concentration and memory, and intact insight ([Tr. 1266]).  Continued improvements were noted in July, and he declined referral to psychiatry ([Tr. 1246]).  His medications were changed in August, as he noted residual anxious and depressive symptoms ([Tr. 1238]).  In October of 2020, the claimant reported that he had been "about the same," with mood fluctuations and some residual anxiety ([Tr. 1187]).  Examination that month continued to show normal cognitive functioning, intact judgment and memory, anxious mood, and normal thought processes, with denial of suicidal ideations ([Tr. 1185]).  At a follow up in January of 2021, the claimant reported that he was doing "alright," with increased ability to overcome panic attacks, and noting that his panic attacks were "not anything serious . . . just some nerves" ([Tr. 1157]).  He was noted to be stable, so no changes were made to his regimen ([Tr. 1159]).  Stability continued to be reported in March of 2021 ([Tr. 1129]).  He noted some increased anxiety in June, and in July, he noted fluctuating but manageable moods ([Tr. 1108]).  His medications were unchanged.  By August, the claimant reported that he had been doing "very well," and felt good that some girls had 'liked' his photo on a dating app that he recently joined ([Tr. 1099]).  In October, it was suggested that he try some vitamins before considering medication changes ([Tr. 1087]).  At a follow up in March of 2022, examination showed normal findings ([Tr. 1073-1074]).  He noted that his panic attacks had been controlled ([Tr. 1060]).

In sum, the claimant's alleged social isolation and inability to concentrate or leave his home is not entirely consistent with the totality of the evidence. For example, when the claimant initiated mental health treatment in September of 2019, he indicated that it had been the first time in a month that he had left his home. However, he also reported reports that he was able to sleep through the night, had friends, and played video games more than four hours a day ([Tr. 749]).  In July 2018, the claimant followed up with complaints of chest pain secondary to anxiety attacks (Tr. 537-585]).  However, mental status examination, showed the claimant was in no apparent distress.   Examination showed cooperative behavior, appropriate grooming, and tangential speech, though he was agitated ([Tr. 725-726]).  Prior hearing testimony also indicated the claimant was able to watch four to five hours of television, read novels, prepare simple meals, clean and dress himself, as well as use a cell phone.  Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.  The undersigned finds the claimant's ability to participate in such activities is not consistent with the degree of the claimant's allegations of functional limitations.  There is no evidence of in-patient psychiatric hospitalizations, residential services, extensive case management services, or other intensive forms of intervention.  His condition has generally remained stable and his treating providers have made conservative treatment recommendations.

\* \* \*

Ashley Conrad, CNP, submitted several statements regarding the claimant's work-related capabilities ([Tr. 1024-1027, 1345-1348). Some of her statements were on issues reserved to the Commissioner ([Tr. 1025-1027]). The undersigned will not provide an analysis of statements on issues reserved to the Commissioner, as this evidence is neither valuable nor persuasive (20 CFR 404.1520b and 416.920b). Ms. Conrad opined that the claimant had "extreme" limitations in all areas of work-related social interactions, but indicated that he would "do better" if able to "find a job with no contact with others" ([Tr. 1025]). She opined "extreme" limitations in working in cooperation or proximity to others without distraction, maintain attention and concentrate for more than brief periods, perform at production levels, respond to changes in work setting, behave predictably, and tolerate customary work pressures. She opined "marked" limitations in using appropriate judgment and carry out instructions and complete tasks; and "moderate" limitations in all other areas of mental work-related functioning ([Tr. 1025-1027, 1345-1348]). These opinions are generally inconsistent with and unsupported by the record as a whole, including the objective examinations of Ms. Conrad, which generally demonstrated that while the claimant experienced mood fluctuations, he was noted to be relatively stable with medication, as discussed in detail above. Memory testing showed no deficits, and while he did note difficulty with group social situations, examinations showed cooperative behavior and full orientation. The opinions of Ms. Conrad are found less persuasive, although her narrative statement regarding the claimant's work-related social interactions ("he would "do better" if able to "find a job with no contact with others") has been incorporated into the residual functional capacity above.

Judy Brenck, CNP, submitted a statement in September of 2019 ([Tr. 711, 754]). As previously noted, the undersigned will not provide an analysis of statements on issues reserved to the Commissioner, as this evidence is neither valuable nor persuasive (20 CFR 404.1520b and 416.920b).

Psychological consultative examiner Dr. Wuebker opined that the claimant could understand and apply instructions appropriately for one step and a few complex workplace instructions ([Tr. 487-495]). The remainder of his assessments were speculative and did not quantify specific limitations in the areas identified, stating instead that the claimant's mental impairments were "likely" to cause limitations. The opinion of Dr. Wuebker is partially persuasive, to the extent that his objective findings upon mental status examinations do not support more extreme limitations. His conclusion that the claimant's mental health issue would negatively impact his ability to maintain attention, concentration, persistence or pace, or have difficulties responding appropriately to supervisors and co-workers is vague and speculative. It also rendered less persuasive by the evidence made available at the hearing level, including updated treatment notes, medication use, and activities of daily living. The limitation that he can tolerate few changes in the work environment with job duties that are performed in a stable and predictable work setting considers Dr. Wuebker's assertion that he would have difficulties interacting with others and difficulty responding appropriately to work stressors, and is consistent with Dr.

Wuebker's own observations that the claimant interacted appropriately with him and was able to complete tasks.

State agency psychological consultants at the initial level of review opined that the claimant was able to complete short-cycle tasks in a setting without fast pace demand; should avoid large group interaction (10+ people); with brief, superficial interactions with others; within a set routine where major changes are explained in advance and gradually implemented to allow claimant time to adjust to new expectations; and was able to handle tasks without strict time limitations or production standards ([Tr. 65-88]).  At reconsideration, it was further opined that he could carry out one- to three-step short cycle tasks without strict production or pace requirements ([Tr. 91-118]).  These opinions are generally consistent with and supported by the record as a whole, and are found persuasive.  While the record did generally show stability with medications, the claimant required medication adjustments, at times, and reported some residual anxious and depressive symptoms, warranting limitations, as specified within the residual functional capacity above. Examinations of record generally showed intact memory, attention, and concentration, although he did require redirection, at times, and had difficulty in group social settings.

State agency medical consultants opined that the claimant had no severe physical impairments ([Tr. 65-88, 91-118]).  These opinions are generally consistent with and supported by the record as a whole, which shows that the claimant's physical impairments cause no more than minimal functional limitations.  They are found persuasive.

(Tr. 765-769).

## 2.    State Agency Reviewing Psychological Consultants

On initial review, on June 12, 2018, state agency reviewing psychological consultant Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT"), (Tr. 70-71), and Mental Residual Functional Capacity Assessment ("MRFC"), (Tr. 72-74).   In the PRT, Dr. Haskins found that Stoodt had mild limitations in his ability to: (i) understand, remember, or apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and (iv) adapt or manage oneself.  (Tr. 70).   In the MRFC, Dr. Haskins opined that Stoodt:

- was not significantly limited in the area of understanding and memory;

- could complete short cycle tasks in a setting without fast pace demand;

- should avoid large group interaction (ten or more people) and should have

brief, superficial interaction with others; and

- could work within a set routine where major changes are explained in advance and gradually implemented to allow time for adjustment to new expectations and could adequately handle tasks without strict time limitations or production standards.

(Tr. 72-74).

At the reconsideration level, on October 7, 2018, state agency reviewing medical consultant Jaime Lai, Psy.D. completed a PRT and an MRFC.  (Tr. 97-101).  Dr. Lai explained that moderate limitations in maintaining concentration and pace, social interaction, and adaptation were consistent with the consultative examiner's findings and the primary care physician's notes.  (Tr. 101).  Dr. Lai further explained that there were only minor edits to the wording of the MRFC for the purpose of better clarity.  (*Id.*).   Dr. Lai's MRFC findings were that Stoodt:

- had no more than mild limitations in the area of understanding and memory;

- could carry out one to three step short cycle tasks without strict production or pace requirements;

- could have brief, superficial interaction with others, but should not be required to interact with large groups (ten or more people); and

- could work within a set routine where major changes are explained in advance and gradually implemented to allow time for adjustment to new expectations and could adequately handle tasks without strict time limitations or production standards.

(Tr. 99-101).

### C.    Relevant Testimonial Evidence

A Vocational Expert ("VE") testified at the hearing on remand.   (Tr. 798-816).  The ALJ reminded the VE that she was finding no past relevant work and then posed her first hypothetical, asking the VE whether there were any jobs for a hypothetical individual with Stoodt's age, education, and work experience, who can perform at all exertional levels with the

following limitations:

> The individual can perform simple, routine and repetitive one to three-step tasks but not a production rate pace.  So, for example, no assembly line work or conveyor belt work.   The individual can respond appropriately to occasional superficial interaction with supervisors, coworkers and the general public.  Superficial is defined as able to be in proximity to others, exchange greeting with others and engage in discussions that do not require the individual to resolve conflict among others or to perform team or tandem work with coworkers.  The individual can tolerate few changes in the work environment defined as routine job duties that remain static and are performed in a stable, predictable work setting.  Any necessary changes need to occur infrequently and be adequately and easily explained.

(Tr. 799-800).   The VE asked the ALJ for clarification on the "one to three step requirement"

because such a requirement "can be interpreted so many different ways."  (Tr. 800).  The ALJ

and VE had the following exchange:

> [ALJ] Yes, I do want to clarify it.  Before I do clarify it[,] I want to have a better understanding of how tasks are broken down.  So, you know, taking a button out of one bowl and putting a button in another bowl would be considered one or two steps?

> [VE] Well I mean I would say that would be two steps.  Taking one out --

> [ALJ] It would be two steps.

> [VE] - - and putting it in would be two steps.

> [ALJ] Okay. And how would you -- versus how would you characterize that if I viewed that as one step?  What would be -- what would be -- how would I clarify that for you?  How – would there be nomenclature that's vocationally relevant that would clarify that?

> [VE] That's – that's why this is so confusing for everyone because it -- it is based on how you break down a task.  And I don't know of any nomenclature that would clarify that.

> [ALJ] Okay.  So if I were to say can perform simple, routine and repetitive short-cycled tasks --

> [VE] Okay.

> [ALJ] -- would that provide clarification?

> [VE] Yes, that would.

(Tr. 801).  The ALJ then asked the VE, given the above clarification, if there were any jobs that

could be performed by such an individual.  (Tr. 802).  The VE testified that the described

individual could perform the following jobs: (i) laundry worker, a medium exertional level, SVP

2 job; (ii) cook helper, a medium exertional level, SVP 2 job; and (iii) kitchen helper, a medium

exertional level, SVP 2 job.[2]  (Tr. 802).

      The ALJ revisited the "one to three step requirement" and the VE discussed how it was

difficult to define what constitutes a step or how many steps are involved in a given task.

(Tr. 802-804).  The ALJ and VE again attempted to clarify the issue:

> [ALJ] I get it then of course, okay.  So if I were to change the definition to one to
> three-step tasks – let's see, so I said one to three step, and what you're saying is the
> definition of step is not clear in the DOT and it's not clear how many steps equal a
> task.  Is that correct?
>
> [VE] Correct.
>
> [ALJ] So if I were to change the wording to one to three -- routine -- simple, routine
> and repetitive one to three-step --
>
> [VE] One to three tasks.
>
> [ALJ] One to three tasks, one to three short cycle tasks, not step.  Take out test --
> step.  Is that -- am I confusing you?
>
> [VE] No, it -- it is a confusing – it's just a confusing topic and, you know, for
> example the kitchen helper they can do a variety of tasks but each task is routine.
> So, you know, one day they might have to wash some dishes and that's routine.
> The next day they might have to mop a floor and that's a routine task.  So --
>
> [ALJ] Okay.  So if I were to say this --
>
> [VE] They just do the same thing.
>
> [ALJ] -- that -- I'm just trying to provide clarification.  The individual can perform
> simple, routine and repetitive one to three short cycle tasks at any given time.

---

[2] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).  "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

[VE] Okay.

[ALJ] So just one minute.  Does that provide clarification?

[VE] Yes.

(Tr. 804-805).  The ALJ then asked the VE whether an individual who was limited to performing "simple, routine, and repetitive one to three short cycle tasks at any given time . . . but not at a production-rate pace, so for example no assembly line or conveyor belt work" could perform the jobs of laundry worker, cook helper, and kitchen helper, and the VE responded affirmatively. (Tr. 806).

The ALJ presented the VE with a second hypothetical that kept the same limitations as the initial hypothetical but limited the individual to light exertion level and added a restriction that the individual can only frequently reach with the right upper extremity.  (*Id.*).  Under the second hypothetical, the VE testified that the previous jobs would no longer remain – as they were at the medium exertional level – but the described individual could perform the following jobs: (i) routing clerk, light exertional level, SVP 2; (ii) housekeeper, a light exertional level, SVP 2; and (iii) merchandise maker, a light exertional level, SVP 2.  (Tr. 806-807).

The ALJ presented a final hypothetical to the VE that kept the restrictions from the second hypothetical and added a new restriction: "that due to symptoms of psychological impairments the individual would be unable to maintain sufficient concentration, persistence and pace such that the individual would be off task 20% of the workday."  (Tr. 807).  The VE testified that 20% off task behavior would be work preclusive but up to 15% off task behavior would be tolerated – with 15% and above being work preclusive.  (Tr. 807-808).  As far as absences, the VE indicated that employers would generally tolerate no more than one attendance incident per month.  (Tr. 808).

12

Stoodt's counsel revisited the ALJ's first hypothetical and had the following exchange with the VE:

> [Stoodt's Counsel] . . . just to make sure I understand clearly where we're talking about one to three-step -- short cycle steps type tasks, and if we look at steps like we would at directions for putting something together or so forth, I just want to make [sure] I understood your testimony that if defined in that nature am I correct that there would not be jobs you could identify?
>
> [VE] If they were one to three step is that what you are saying?
>
> [Stoodt's Counsel] That is correct.
>
> [VE] I -- I would think, yes, I could not, um-hum.

(Tr. 808-809).  Stoodt's counsel asked the VE if an individual was restricted to no more than brief interactions – defining brief as "less than occasional" and "no more than 15% [of a workday]" –  would such an individual "have difficulty making it through employer evaluations, interview process, [and] learning the tasks that make up the job . . . ."  (Tr. 809).  After the ALJ interjected to ask the VE how she would define rarely, the VE testified that: (i) rarely is not a vocational term; (ii) after occasional, the next level of frequency is none; (iii) the interview process does not apply to what's required on a daily basis at a worksite; and (iv) rarely seemingly means less than occasional, which would be work preclusive.  (Tr. 809-810).

Stoodt's counsel then presented the VE with a hypothetical where the term superficial was altered from the ALJ's definition to now mean "no more than shallow or cursory interaction with others" – with counsel interpreting shallow or cursory interactions to mean things such as "passing someone in the hallway and saying good morning and then you continue on." (Tr. 810-812).  After expressing some confusion over what counsel meant by "shallow," the VE responded: "Well if you can't say more than hello when you're walking in the hall, then -- to anyone, including coworkers and supervisors, then I would say that's work preclusive. . . . That's very restrictive."  (Tr. 812).  The ALJ later clarified the frequency limitation and the VE

13

testified that if there were: (i) no limitations on social interaction then the previously identified jobs could be done; (ii) a limitation to occasional interaction then the identified jobs could be done; and (iii) a limitation to absolutely no interaction of any kind then the identified jobs would be excluded.  (Tr. 814-815).

## IV.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers*, 486 F.3d at 241; *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) ("Substantial evidence supports a decision if 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' backs it up." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971))).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek*, 880 F.3d at 783 ("It is not our role to try the case *de novo*." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-00734, 2011 U.S. Dist. LEXIS 141342, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-1982, 2010 U.S. Dist. LEXIS 75321, 2010 WL 2929562 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational

expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments'" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations [she] finds credible."  *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

### B.  Step Four – Whether ALJ Failed to Properly Account for State Agency Reviewing Psychological Consultants' Opinions

Stoodt contends that the ALJ erred in making her RFC findings because she did not properly account for the state agency psychologists' opinions, provide a logical explanation of why she deviated from expert opinion evidence on the record, or explain how she came to her ultimate determination.  ECF Doc. 7 at 8; ECF Doc. 11 at 1-4.  Specifically, Stoodt argues that the ALJ erred when she: (i) improperly created a definition of "superficial" interaction without explanation; (ii) used – without explanation – the term "occasional" instead of "brief," a term used by the state agency psychologists to limit social interaction; and (iii) used ambiguous language in the RFC concerning the limitation to "one to three step" tasks.  ECF Doc. 7 at 9-13.

#### 1.  RFC Definition of "Superficial"

In his first assignment of error, Stoodt argues that the ALJ provided an improper, arbitrary definition of the term "superficial."  *Id.* at 9.  He argues that the ALJ "went out of her

way to give her own definition of what superficial meant" and she failed to provide any

reasoning or explanation for how she created that definition or for rejecting an alternative

definition the Appeals Council used in a separate case – which Stoodt's counsel provided to the

ALJ on the record.  *Id.* at 9-10.  The Commissioner disagrees, arguing that regulations and

caselaw do not define the term "superficial" and Stoodt did not provide citation to any legal

authority which requires an ALJ to provide explanations for the definitions of terms.  ECF

Doc. 9 at 4.  The Commissioner contends that the definition provided in the case cited by Stoodt

is inapposite because: (i) the ALJ in that case did not explain how she came up with her

definition for superficial; and (ii) the ALJ here "was not legally bound by [an] administrative

order from another case, based on another set of facts, that contained no citation for its

description of superficial contact."  *Id.*  Moreover, the Commissioner argues that the ALJ's

definition of superficial is substantively consistent with the definition cited by Stoodt and

consistent with definitions found proper in prior cases.  *Id.* at 5-6

Stoodt replies that there is no way to understand where the ALJ's definition for

superficial came from and this court cannot conduct an adequate review because the ALJ:

(i) created a specific definition; (ii) did not explain how she arrived at the definition; (iii) did not

identify anything in the record to support the definition; and (iv) did not identify what evidence

led to the definition.  ECF Doc. 11 at 1-2.

I find no merit to Stoodt's argument.  Stoodt is correct that the ALJ included in her RFC

a definition of "superficial interaction" that was not present in the opinion of the state agency

psychologists and did not comport with the definition from another court provided by Stoodt.

However, not only do the state agency psychologists fail to define the term, (Tr. 73, 101), but

there is no regulatory definition provided in the Dictionary of Occupational Titles ("DOT"), or

Selected Characteristics of Occupations ("SCO").  *See Stoodt I*,

*report and recommendation adopted*, 2022 WL 716105.  Further, Stoodt has cited no authority holding that an ALJ is bound by – or required to differentiate based on – the definition of a term the Appeals Council used in a separate case.  The regulations provide that it is the ALJ's exclusive duty to assess the claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician.").  Thus, the ALJ was required to convert the undefined term into a vocationally relevant RFC finding and explain the basis for her definition.  *See Charles N.A. v. Comm'r of Soc. Sec.*, 2:22-CV-3085, 2023 WL 312791, at *4-5 (S.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, 2023 WL 1766096 (S.D. Ohio Feb. 3, 2023); *Ferrell v. Comm'r of Soc. Sec.*, No. 1:19-CV-2289, 2020 WL 6505055, at *9-10, at *28 (N.D. Ohio Nov. 5, 2020).

Here, the ALJ applied the proper legal standards and reached a decision supported by substantial evidence in determining that Stoodt was limited to "superficial" social interaction.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ defined "superficial" as: "able to be in proximity to others, exchange greetings with others, and engage in discussions that do not require the individual to resolve conflict among others or to perform team or tandem work with co-workers."  (Tr. 765).  Stoodt's main contention is that the ALJ created an arbitrary definition for the term "superficial interaction" because she failed to adequately explain how she chose her definition of the term.  I disagree.  First, the ALJ defined the scope of "superficial" interaction and used that definition both in posing hypothetical questions to the VE and in articulating her RFC findings. (Tr. 764-765, 800).  Second, the opinion evidence on the record provided no conflicting definition for "superficial" interaction, nor has Stoodt cited to any such evidence.  Finally, although the ALJ's exact definition has not been used in other cases, courts have found that an RFC which limits a claimant's interaction to "no team or tandem tasks"

properly accounts for a limitation of a claimant to superficial interaction with others.  *See, e.g.*, *Duma-Quigley v. Comm'r of Soc. Sec.*, No. 3:22-CV-917, 2023 WL 3016861, at *4 (N.D. Ohio Apr. 20, 2023); *Kearns v. Comm'r of Soc. Sec.*, No. 3:19-CV-01243, 2020 WL 2841707, at *12 (N.D. Ohio June 1, 2020), *report and recommendation adopted*, 2020 WL 2839654 (N.D. Ohio Feb. 3, 2020) ("The ALJ's limitation to no team or tandem tasks is a qualitative limitation on social interaction and adequately addressed the [expert opinions] that Kearns be limited to superficial interaction with others."); *Romo v. Comm'r of Soc. Sec.*, 2021 WL 5040385, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 4437062 (N.D. Ohio Sept. 28, 2021) ("Here, since the ALJ limited Claimant to 'no tandem work', such a limitation prevents him from working alongside coworkers and supervisors.  It logically follows then that the only interaction that Claimant would have with his coworkers and supervisors would be superficial.").  Considering the above, it is hard to conclude that the ALJ's definition of superficial interaction was arbitrary.

Moreover, reading the ALJ decision as a whole and applying common sense, I find that the ALJ gave adequately supported reasons for the RFC definition of "superficial interaction." *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010).  Although the ALJ must connect the RFC limitations to the evidence and build a "logical bridge" between the two, this does not require that the ALJ provide exhaustive reasoning for why she defined superficial the way she did.  Rather, the ALJ needed to explain why she determined that Stoodt was limited to superficial contact *as she defined it*, and it is sufficient that the record not be clearly contrary to that definition. *See Fleischer*, 774 F. Supp. 2d at 877.  The ALJ's discussion of the record evidence in making her RFC findings provides such a bridge.  At Step Three, the ALJ contrasted Stoodt's claimed difficulties with being around others with positive mental exam findings, Stoodt's cooperation and pleasant demeanor during medical interviews and treatment,

and Stoodt's ability to perform routine activities of daily living, including those performed in the community, from which the ALJ concluded that Stoodt would have no more than moderate limitations in his ability to interact with others and adapt or manage himself.  (Tr. 763-764). Similarly, at Step Four, the ALJ incorporated the state agency psychologists' opinions that Stoodt should be limited to "superficial" interaction with others and explained that the limitations in the RFC were adequate as to Stoodt's ability to interact because of evidence that he had been able to communicate, cooperate, and engage with treatment providers, and also engage in activities that required the same abilities and social interactions necessary for obtaining and maintaining employment.  (Tr. 768).

Thus, with regard to the ALJ's definition of "superficial" interaction," the ALJ's analysis followed the framework of the regulations, her definition is supported by substantial evidence, and she built an accurate and logical bridge between the evidence and her definition of "superficial interaction."  *See Fleischer*, 774 F. Supp.2d at 877.  This portion of Stoodt's argument lacks merit and provides no basis for remand.

### 2.    RFC Limitation of "Occasional" Interaction vs. "Brief" Interaction

In his second assignment of error, Stoodt argues that the ALJ erred when she created an RFC that limited Stoodt to "occasional" interaction because: (i) the state agency psychologists opined that Stoodt should be limited to "brief" interaction; (ii) the ALJ found those psychologists' opinions to be persuasive; and (iii) the VE testified that if the ALJ's hypothetical was altered to include the term brief instead of occasional, such a limitation would be work preclusive.  ECF Doc. 7 at 11-12.  The Commissioner responds that the ALJ's restriction to "occasional" interaction sufficiently accommodates the state agency psychologists' findings and Stoodt has cited no authority that "brief" is a relevant term of art or that a limitation to "occasional" interactions does not accommodate a limitation to "brief" interactions.  ECF Doc. 9

at 5-6.  The Commissioner further argues the VE testified that if "brief" interaction was defined as "less than occasional" then it would equal no interaction and therefore be work preclusive, but the VE and ALJ ultimately rejected Stoodt's definition of "brief."  *Id.* at 6.  Lastly, the Commissioner argues that the state agency psychologists never defined "brief" as "less than occasional" and they would know that anything less than occasional would mean no interaction. *Id.* at 7.

As noted above, the state agency psychologists opined that Mr. Stoodt should be limited to "brief, superficial interaction with others." (Tr. 73, 85, 101, 115).  By comparison, the RFC provided: "[Stoodt] can respond appropriately to *occasional*, superficial interaction with supervisors, co-workers, and the general public."  (Tr. 764-765) (emphasis added).  In general, an ALJ is not required to adopt a medical source's opinion on limitations verbatim in assessing a claimant's RFC.  *Poe*, 342 F. App'x at 157; *see* SSR 96-5p, 1996 SSR LEXIS 2, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment.").  "Even [when] an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395, 2013 WL 6283681, at *7-8 (N.D. Ohio Dec. 4, 2013) (finding ALJ who gave great weight to an opinion was not required to incorporate all limitations from that opinion).

That said, Social Security Ruling 96-8p requires the ALJ to consider all medical opinions in her RFC assessment and, when her assessment "conflicts with an opinion from a medical source," she "must explain why the opinion was not adopted."  SSR 96–8p, *Assessing Residual*

*Functional Capacity in Initial Claims*, 1996 WL 374184, at *7 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).  Since the ALJ did not provide an explanation for why she adopted a limitation to "occasional" interaction instead of the "brief" interaction provided in the state agency psychologists' opinions, the question becomes whether this alteration in the RFC "conflicted" with the expert opinions, such that the ALJ would be expected to explain her decision under SSR 96-8p.

This alteration presents a close call.  The medical opinions at issue indicated that Stoodt should be limited to "brief, superficial interaction with others"  but they provided no specific definition for the term "brief," (Tr. 73, 85, 101, 115), nor is the term is defined within the DOT or SCO.  Further, Stoodt has provided no argument that that the term "brief" is a term of art in the Social Security and disability context. By contrast, the DOT and SCO do have specific defined terms for the frequency of activities or conditions, defining "occasional" activities and conditions as those existing up to one-third of the time.  *See Beasley v. Berryhill*, No. 5:16-CV-00108, 2017 WL 2543814, at *2 (W.D. Ky. June 12, 2017) (explaining that "[t]he terms 'occasional' and 'frequent' are terms of art in Social Security law [and] '[o]ccasional' means occurring from very little up to 1/3 of the time") (citing SSR 83-10, 1983 WL 31251). Consequently, it is unsurprising that the ALJ avoided using the term "brief" both in her RFC and hypothetical questions to the VE in favor of terms that have clear definitions in both the Social Security and disability context.[3]  In fact, the VE stated that "brief" was not a vocational term during the hearing on remand and it was her understanding that "less than occasional" would mean no social interaction at all.  (Tr. 809-810).

---

[3] In *Stoodt v. Comm'r of Soc. Sec.,* No. 3:20-CV-02370, before ultimately remanding the case, the court found that the ALJ's limitation to "occasional interactions" with others "does not conflict with the psychological consultant's more vague limitation to 'brief' interactions, and thus did not require further explanation under SSR 96-8p." 2022 WL 721455, at *17 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022).

Again, Stoodt has cited no authority suggesting that brief is a term of art in the disability context nor does he offer any persuasive argument as to why a limitation of occasional interaction is inconsistent with or fails to sufficiently encapsulate "brief" interaction.  "To the contrary, many courts have found that when, as here, an ALJ properly gave considerable weight to a medical opinion stating a claimant's ability to handle brief and superficial contact, an RFC containing a limitation to 'occasional interaction' is supported by substantial evidence."  *See e.g. Ward v. Comm'r of Soc. Sec.*, No. 18-CV-1317, 2020 WL 3035850, at *3 (W.D.N.Y. June 4, 2020) (collecting cases).  *But see Charlee N. A. v. Comm'r of Soc. Sec.*, No. 2:22-CV-3085, 2023 WL 312791, at *4 (S.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, No. 2:22-CV-03085, 2023 WL 1766096 (S.D. Ohio Feb. 3, 2023) (finding that the omission of a "brief" limitation on social interactions without explanation required remand because "brief" is commonly understood to mean short in duration while "occasional" pertains to the frequency of social interactions).  Thus, this portion of Stoodt's argument also lacks merit and provides no basis for remand.  *Cf. Toth v. Berryhill*, No. 1:18-CV-01454, 2019 WL 3412623, at *6 (N.D. Ohio July 12, 2019) ("Absent any compelling argument that the term 'brief' is more limiting than 'occasional,' the court finds no purpose would be served by a remand.").

### 3.     RFC Containing Impermissible Ambiguous Language

In his third and final assignment of error, Stoodt essentially argues that the RFC is invalid because it contains ambiguous language that makes it impossible to evaluate the ALJ's ultimate conclusion.  Specifically, he argues that the "one to three step" limitation provided in in the RFC is ambiguous mostly due to the exchange between the ALJ and VE at the remand hearing, when: (i) the VE expressed confusion and asked for clarification on the "one to three step requirement" and on what precisely constituted a step; and (ii) the VE could only answer the hypothetical once the one to three step language was removed.  ECF Doc. 7 at 12-13.  The Commissioner responds

that the exchange between the ALJ and VE is not evidence of ambiguous language but of a miscommunication that was ultimately clarified.  ECF Doc. 9 at 7.  He further argues that the RFC only contains one additional word that was not in the hypothetical presented to the VE – "step" – and this one-word difference is harmless to Stoodt and remand would be beyond the function of this court.  *Id.* at 9.  Stoodt replies that the VE was only able to answer the hypothetical once the one to three step language was *removed* and that *reinserting* that language into the RFC when it was not used in the VE hypothetical is reversible error.  ECF Doc. 11 at 4.

Here, there appears to be uncertainty created as to the parameters of the "one to three step" limitation provided in the RFC but it must be determined whether this uncertainty is sufficiently harmful to warrant a remand for further explanation.  The ALJ did not provide the one to three step language in her first hypothetical, instead she posed the following: "The individual can perform simple, routine and repetitive one to three short-cycle tasks but not at a production rate pace." (Tr. 800).  It was the VE who brought up the "one to three step requirement" and asked for clarification as to what constituted a step.  (Tr. 800-801).  After discussion, the ALJ kept the "one to three step" limitation out of the hypothetical and "clarified" that the hypothetical individual "can perform simple, routine and repetitive short-cycled tasks." (Tr. 801).  Given this specific limitation, the VE provided a list of jobs that the hypothetical individual could perform.  (Tr. 802).  The ALJ and VE further discussed the confusion over "one to three step" tasks, with the ALJ then altering the hypothetical to provide that the hypothetical individual "can perform simple, routine and repetitive one to three short cycle tasks at any given time . . . but not at a production-rate pace, so for example no assembly line or conveyor belt work."  (Tr. 802-806).  The VE testified that the list of jobs previously provided could be performed with this "clarified" limitation.  (Tr. 806).

On cross-examination, Stoodt's counsel asked for clarification about whether a "one to three step" limitation would be work preclusive and the VE seemingly confirmed that she could not identify any jobs if the ALJ's first hypothetical was altered to restrict an individual to performing only one to three step tasks.  (Tr. 808-809).  This explains the confusion created when the RFC provided that Stoodt "can perform simple, routine, and repetitive *one to three step* short-cycle tasks at any given time, but not at a production rate pace so, for example, no assembly line or conveyor belt work."  (Tr. 764) (emphasis added).

The lack of clarity and ambiguous language at issue in this matter infested both the RFC and the hypothetical question posed by the ALJ to the VE and created an impediment to our ability to fully review the ALJ's Step Four and Step Five analyses.  A hypothetical question must accurately portray a claimant's physical and mental impairments and a hypothetical that omits restrictions or does not properly convey restrictions to the vocational expert warrants remand. *Ealy v. Comm'r of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010) ("In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform [the specified] work, the question must accurately portray a claimant's physical and mental impairments."); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (providing that an ALJ's hypothetical question should include "all of a claimant's limitations").  An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.

Throughout the hypotheticals, the ALJ removed any language concerning a one to three step limitation and the VE appeared to testify that a one to three step limitation was work preclusive.  Because the ALJ did not provide any explanation why the one to three step language was included in the RFC – despite the colloquy with the VE – the court can only speculate as to

25

the reason for its inclusion: a typographical error, a failure to fully account for Stoodt's impairments in the hypothetical, or a decision to discount the VE's testimony.  If the court cannot determine what specific limitations the ALJ found for Stoodt, it cannot determine whether appropriate limitations were included in the RFC or whether the hypothetical questions posed to the VE were appropriate or whether the VE's responses provided substantial evidence to support the ALJ's findings at Step Five.  *See Vonlinger v. Berryhill*, No. CV 16-319-DLB, 2017 WL 2568931, at *6-7 (E.D. Ky. June 13, 2017).  Moreover, without further explanation, the court cannot determine whether the ALJ's reasoning and ultimate conclusions were supported by substantial evidence.  Thus, a remand is needed so that the ambiguity and uncertainty in this matter can be resolved.  *See Ealy*, 594 F.3d at 516; *Lee*, 529 F. App'x at 715.

## V.    Recommendation

Because of the unresolved ambiguity in the RFC as outlined in the previous section, I recommend that the Commissioner's final decision denying Stoodt's applications for DIB and SSI be vacated and that Stoodt's case be remanded for further consideration.  In all other respects, I recommend that the Court find Stoodt's arguments to lack merit.

Dated: August 4, 2023

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§

636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).